On the first case, 519-0104, Peoples National Bank v. Darnell Good morning. Court, please depart the council. My name is Eric Turrilizzi. I practice in Salem. I represent the defendant, Bobby Darnell, Jr. here. The plaintiff received a nearly quarter-million-dollar judgment against my client based on a count on a guarantee of a note to a Mr. Thorson. The bank loaned this money to Mr. Thorson to buy an appliance store, and unfortunately, it weren't here because that loan went south in a few years. Obviously, if it had been paid, nobody would be here, but it did not. So the bank proceeded on a count one to foreclose the mortgage it had taken on the business property, and then count two on the guarantee that Mr. Darnell signed. The evidence is absolutely undisputed that on May 18, 2012, when the principal loan was made to Mr. Thorson, what the bank had in its file with respect to this guarantee was Exhibit D to the complaint, Plaintiff's Trial Exhibit 1, this. One page, page 505 of this purported guarantee that has two paragraphs in it. The evidence is also very open as to whether Mr. Darnell even in fact had anything besides this page 505. Mr. Baird, the president of the bank, there's some testimony, oh, we would have sent him the whole guarantee, but that's the extent of the testimony. There's no cover letter, there's no anything else showing that Mr. Darnell, when he signed and faxed back actually the day before this loan was made, this page 505 of this purported guarantee had anything else besides that. Mr. Terlizzi, your client doesn't dispute signing this document. He doesn't dispute that that's his signature. You're correct, Your Honor. And is there any testimony that indicates he didn't know what was in the guarantee? I think there's substantial testimony. Mr. Darnell testified that he understood through discussions, and the only actual personal discussions had occurred in February, months before this loan and before any of the terms were really known or understood at all or whether this loan was even going to be made. But Mr. Darnell testified, for example, he thought he was guaranteeing the building, what the building pays for, $160,000 to $170,000. The guarantee ended up being for $310,000, which would have included the inventory, operating capital, and so on. But wasn't there testimony that the bank sent Mr. Darnell the full packet that included the guarantee and that the wife faxed back the pay with his signature? The actual testimony, Your Honor, of Mr. Baer, Mr. Darnell's testimony, I don't remember. I'm not denying that's my signature, but I don't really remember what we got, what I signed, but that's my signature. That's not a forgery case. So he doesn't dispute that he might have gotten it? He might have. The full packet? Right. And Mr. Baer's testimony is, well, it would have been our practice to send it to him. But again, there was no cover letter saying, which obviously should have been in the bank's file, Mr. Darnell, here's the loan package. This is what you're guaranteeing. Please sign page five of the guarantee and return all five pages. In fact, as we found out at trial, but not before trial, a month later, the bank insisted on getting a full five-page, fully originally signed guarantee. And that came into evidence, I think it was dated June 20th. Now, the bank didn't sue on that. In fact, we didn't even know about that until trial because obviously a guarantee executed after the loan is made requires additional consideration. The horse is already out of the barn. The money's already been lent. So they knew they couldn't sue on that. They also – That was more of a formality. That wasn't a requirement that the bank – That's what Mr. Baer said, yeah. That we just wanted to cross our T's and dot our I's. So – But Mr. Darnell didn't dispute that, did he? He didn't dispute that he signed it. Yeah. There is – The part after the guarantee, after the fax page that you have – The June – Let's call it the June guarantee. The June guarantee. Right. That was more of a formality, as you say, dot your I's, cross your T's. There was no requirement that the bank do that. Well, I don't know. I mean, if this is all I had in my loan file, Your Honor, and that's undisputed in this record, that's more than crossing T's or dotting I's are formalities. I mean, I've represented a bank for 40 years, and if this was what I had to say that I've got a loan guarantee – And that part is undisputed. We cited the testimony of Mr. Baer at page 25.6 of the transcript, where he says, yeah, that's what we have when we make a loan. And why that's particularly significant, too, is, you know, we have to remember that a guarantee is just – is a contract like any other contract. And what is – what's the first day of contracts 101 teach you? A contract is a meeting of the minds, which means you have to have agreed on the essential terms of what this contract is. This gives a number of terms. Even if, in fact, he had the other four pages, which we don't really know from this record, but if he did have them, all it says is the principal amount, $310,000. Now, when you go into a bank or a finance company or a car dealer to get a loan, what is the first question you ask? What rate will you give me? If that's not an essential term of a loan, what is? We don't know, assuming that he had this entire guarantee on May 17th when he signed and faxed it back. We don't know what the interest rate was. We don't know whether it was fixed or variable. We don't know if he had a balloon payment. Absolutely nothing about it. Now, if that's not an essential term – and why that's so important is because that's the contract. That's as important as the loan contract. And maybe to illustrate that, suppose we switch things around and a bank gave a written loan commitment for $310,000, and that's all it said. And then the bank reneged on that, and the customer sued for specific performance, saying, I want my loan. I think the judge would laugh the customer out of court, saying, I'm not here to make a contract for you. I'm here to help enforce contracts you've already made. What am I supposed to do, pick an interest rate, an amortization, all these other terms of a loan? I'm just out of thin air. And really, the guarantee is no different. This record is silent that on May 18th, when this loan was made, that Mr. Darnell knew any of those essential terms of this purported loan. And that's why there is case law that says – I mean, there's a clear case law that says if you execute a guarantee after a loan, there has to be additional consideration. And that's just common sense. There's also the case law that we cited that says if you execute a guarantee before the loan is made, the essential terms of the proposed loan have to be clear and disclosed, and you have to agree to it. Otherwise, there's not a meeting of the minds. There's not a contract. And the bank did not sue on an estoppel cause and say, oh, we detrimentally relied on this page 505 when we made the loan that you were going to come through and cross T's and dot I's and send that guarantee. They sued on a contract count. And this is the contract they sued on. So it was the bank's burden of proof. Is that Exhibit D? Is that what you're saying is one page was Exhibit D? No. Exhibit D to the complaint is the full five pages. Right. But it's crystal clear in the testimony from Mr. Baird himself that page five is all the bank had when they made this loan. So my question to you is how did the parties get beyond the four corners of Exhibit D? How did they get all this oral evidence in about the making of the terms, the meeting of the minds? I mean, Exhibit D, which is a U.S. small business loan, right, document, would have been complete in and of itself. Well, I mean, that presupposes that Exhibit D, which doesn't contain all the essential terms of the loan that is supposedly guaranteed, is a contract. It doesn't represent a meeting of the minds. As I said, it doesn't disclose anything. So you filed some kind of affirmative defense on behalf of your client? We did. And one of the affirmative defenses was fraud in the execution based on the allegation that he had been told, one, that he was only going to be guaranteeing $170,000, the value of the building, and two, that he explicitly made it known that he had to be – he's a tobacco farmer down in Tennessee. And he's got an operating loan that came up in three years. And it's undisputed that that was discussed. Of course, Mr. Baird says, oh, you know, if things are okay in three years, we'll let you off. And, in fact, the loan was not going to fall in that three years. But Mr. – but the bank did let him off because he didn't have enough money in his account, apparently, in his business account for that. Are you saying your client took action with the bank to try to get off the note after three years? There were – yeah, the record's clear that there were phone conversations where he requested that. Now, the – But I'm still perplexed on how you got to all of that. Clearly, your client, even in his affirmative defense, acknowledged that he intended to make some loan. He acknowledged that he understood that he had agreed, in theory, to guarantee a loan. Actually, Your Honor, if you read the record, that affirmative defense was dismissed. The trial judge took that evidence in the form of an offer of proof. Which evidence? The one about the $70,000? Yeah, and about getting her off in two or three years. Yes. And I haven't looked at the notice of appeal in a while. Was that also part of your appeal then, was the inappropriate dismissal of the affirmative defense? I don't know that that's referenced in the notice of appeal, Your Honor. I wouldn't want to tell you it is and then be wrong. Okay. Okay. I just didn't see it in the facts of the case. But I was perplexed as to how all of this plural evidence came in when you – Well, I could tell you I was a really good lawyer, but that's not the truth. Okay. It came in as an offer of proof. Okay. Thank you. You're welcome. But I guess I don't need to beat a dead horse. That is our position in this appeal. What does the bank have to do when you get into a situation like this and your clients as well? It could have, I don't remember. I mean, what is the standard of review for us? Is it against the way of the evidence or is it to help us? Well, I think it's really more a question of law, Your Honor, on the issue of whether this guarantee, even if he had all five pages when he signed and faxed it back, if that is an enforceable contract or not. Well, if he had all five pages, what would be deficient about it? What's deficient is it doesn't reflect a meeting of the minds as to what he's guaranteeing because it does not contain the essential terms of this proposed loan. That didn't even exist on the day he signed this. That's undisputed. But it was anticipated. Okay, so if you could break that up, let's assume hypothetically that he had the five pages that the bank sued him. Correct. Which terms were absolutely missing from the five pages? The interest rate, whether it was fixed, variable, balloon, amortization, none of those terms were in this guarantee, in the full five pages of the guarantee. The only thing he knew was that the proposed loan was to go to his buddy, and that the principal, assuming he had these five pages, was going to be $310,000. That's it. That's why I say if that was a loan commitment from the bank, that would not be an enforceable contract against the bank because the court would have to supply the interest rate, the amortization, all those terms that are absolutely necessary. You cannot say that those are not probably the most necessary, the most crucial elements of a loan contract. So, again, I mean, if you had a note that just said $310,000 and didn't contain an interest rate, an amortization rate, now, you know, maybe you could enforce it as a quantum merit matter, that you let $310,000 and the guy would pay it back, but the court could not supply and say, all right, I'll finish your contract for you. I'll pick a fair interest rate, a nice amortization. Maybe we should make it balloon after five years or make it a variable rate, fix the prime. The court could not do that. The court's not in the business of making contracts. The court's in the business of enforcing contracts. But let me ask you a question. Sure. The form that is used for the guarantee, I'm assuming it's called SBA Form 148, so that comes straight from the government. Apparently. There's nothing in that document where it specifically lists what the interest rate is or things such as that. It references the promissory note, which would have all of that information included in it. So are they not referring back to that? Well, and that works. If you've got everybody at the table sitting down when the loan is executed and you pass the documents around and it's executed contemporaneously, the guarantor can leave with a copy of the note. Or if they had sent and they had provided at trial, you know, a cover letter to Mr. Darnell saying enclosed is the proposed guarantee, attached to it as exhibit A is the proposed note containing all the terms, then you've got a contract. You've got a meeting of the minds, even if it's sent back before the loan is actually given because he knows all the essential terms. This record, and again, plaintiff's burden of proof, not ours to defend. We didn't have to put on one word evidence. I don't think, I really think we should have been entitled to a directed verdict based on the fact that they failed to prove, even if they sent all five pages, that he had what he obviously didn't have any idea of those other essential terms of this loan. So, and this, you know, we're not talking about a $1,000 loan by the washing machine. We're talking about a $310,000 loan that now, some seven years later, even after sale of the security for $90,000, we're talking about a quarter million dollar judgment, a judgment that could put this man out of business. This is not small claim stuff. And for the bank, at trial, not even to be able to produce anything, anything, a cover letter, anything to show that he was specifically informed of and knew the essential terms of this loan and agreed to guarantee it before this loan was made, that was their burden of proof, and they failed. We know why they didn't sue on the June 2012 guarantee that is properly executed, that is all five pages, that was after the loan was made, so those terms were known, because they couldn't sue on that, because there was no additional consideration. And that's Hornbook law, that a guarantee made after the loan requires additional consideration. Could be forbearance, could be whatever, but, I mean, this loan was only a month old. There's no allegation that it was a default or there was any forbearance or anything in June. So it's a case that looks simple on the first glance. Oh, he signed. He owes. But that's a shallow reading of this evidence and of the law in this case. And it's the bank's, you know, the bank, this didn't have to happen. The bank could have said, you know, we insist on a guarantor on this loan, Mr. Thorson. You have your guarantor there at closing. Get all the documents signed. And, you know, again, we wouldn't be here because you wouldn't have a defense done. So unless there are any other questions, that's all right, Your Honors. Thank you. Thank you. You don't have an opinion as to the situation? Am I pronouncing that correctly? You are, yes. Thank you. All right, Mr. Hoffman. Good morning. Good morning. I'm going to steal a glass of water real quick. Take your time, sir. Good morning, Your Honors. May it please the Court. I'm trying to lose my voice this morning. I apologize. Mr. Terlizzi, Your Honors, I am, to start out, going to take what Mr. Terlizzi referred to as the shallow view of the case The case boils down to is that Mr. Darnell signed this SBA unconditional guarantee not once, but twice in this case. May 17th, he faxed back his signature page, after which Beau Baird testified to a trial. He had sent him, in the normal course of these dealings, sent him the entire unconditional guarantee, all five pages, down to him at his address in Tennessee. He said that's the normal way he would have done it. They had spoken on the phone previously. They had met previously. They had multiple phone conversations. I think page 20 of the record proceedings notes that. They also had an in-person meeting, I believe, back in February before the May closing. Mr. Hoffman, let me ask you a question that kind of was raised by Justice Foley. This guarantee, where was the promissory note? Was it attached? Was there an exhibit? There is no evidence in the record that it was attached to the guaranteed note yet. There's no evidence? There's not evidence of that that I can recall from the record. If a document refers to the note, which this one did, this SBA form, wouldn't you expect to see the note attached? And wouldn't we be out of all this trouble if the note were there? I don't believe that was required, Your Honor. Why not? It's part of the contract. Well, the guarantee itself, the SBA form, which Beau Baird testified that is the government mandated for this type of a loan, this type of loan guarantee form, and the bank, I believe he stated, cannot deviate from that form. It lays out who the parties are. It lays out the amount of indebtedness that is being guaranteed. I think here it was $306,000, if I'm not mistaken, and it lays out the additional terms of the guarantee. So I don't believe there's any indication that it was required to attach the note. It is our position the guarantee laid out the necessary terms for Mr. Darnell to review that document, which he had two opportunities to do after it was sent down to him and he faxed back his signature page. I would note he admitted that it was his signature, that fax signature. He admitted that it was generated from his home phone number in Tennessee. Mr. Baird testified as well that prior to this, whenever Mr. Darnell filled out the SBA guarantee application, he also faxed up that application with his signature on it from that same phone number. And Mr. Darnell, I believe, just for full statement of what was the testimony, I believe he indicated he didn't recall faxing it up or he is not the one who faxed up the May 17th signature page, but his wife may very well have done so. However, as a matter of housekeeping, and I think as Justice Cates you referred to as dotting the I's, crossing the T's earlier, Beau Baird testified that after he, that it was not required in the bank's eyes to close the loan, to have an original signature on hand for this guarantee, but it would be preferable for housekeeping purposes to quote, unquote, clean up the file, I think were Mr. Baird's words, to have an original signature. So he, after he didn't receive one, which was his understanding, and it may be mistaken, but I think in the record Mr. Baird testified that it was his understanding in talking to Mr. Darnell ahead of the sending him the guarantee in one of these phone conversations perhaps, that he was under the impression he was going to be getting it in the mail subsequently. And it did not arrive. There was reference to possibly it was lost in the mail. That's Beau Baird's testimony. So in order to dot the I's and cross the T's, he sends it back down to Tennessee, testified at trial that it was the identical document, short of an A-17 signature, had a blank signature spot and date spot, and he did receive that back. So Mr. Darnell had two opportunities to review this document, showing the amount of indebtedness, showing what he was guaranteeing, and executed it both times. So you believe the record is clear that Mr. Darnell indicated that the guarantee he received in June was the same one that he received in May? I don't believe he testified to that, Your Honor. I think Beau Baird testified to that, that he sent the identical guarantee down. Right, but Mr. Darnell has no recollection. I believe that's accurate. Yes, Your Honor. But, Mr. Baird, again, when we look at the SBA form, it doesn't have an interest rate, obviously. It does state the name of the borrower, the guarantor, the lender, the date of the transaction, loan number, principal amount, all of that. Yes, Your Honor. It does not require the promissory note to be attached. That's correct, Your Honor. And I would add, in terms of opposing counsel's argument that the interest rate was an essential term to be included in the guarantee, there's no authority under Illinois law cited in their brief. I've not found authority stating you've got to have the interest rate in the guarantee for it to be legally valid. The only reference made in the briefs is to the U.S. I believe it's U.S. v. Fitzgerald case out of the Seventh Circuit, which I would note, as I noted in our brief, is the Seventh Circuit applying Indiana law specifically. And they do indicate that interest rate is an essential term along with the amount of indebtedness. But we don't have Illinois authority on that. I don't think it's required. And, again, as has been noted a few times here, this was an official small business administration form. It does not provide a space for inserting the interest rate, and Beau Behr testified at trial that he could not deviate from the requirements of that form. So we believe that the May 17 signed guarantee, that signature page, was valid and enforceable, as the trial court found. It was executed before closing. And it's our position that the June 20 signature was part of the same transaction. Again, it was a housekeeping matter. We dispute, we completely disagree with the notion that additional consideration was required for that June 20 guarantee or that we somehow couldn't sue under that June 20 guarantee because it was subsequent to the May 18 closing. This is arising out of the same transaction. You have a clear layout in the testimony of Mr. Behr of the signature events that led to that June 20 signature. And the entire document, I believe, coming up in the mail, not just the signature page this time. It's out of the same transaction. Granted, it's a little more than a month later, but it was to tie up any loose ends. Beau Behr testified he was comfortable moving forward on May 18 with the closing. If he would have needed an original signature on that guarantee ahead of the May 18 or at the May 18 closing when all he had in his hand was the fact signature, he wouldn't have closed the loan. And we're talking about a government-backed loan here for a substantial amount of money. It's not something anybody's going to play around with or cut corners on. And that wasn't done here. We do cite in reference to the June 20 signature being contemporaneous to the May 18 closing, we cite the LDS case out of the appellate court which found similarly a guarantee executed several days later, I think six days later in that instance. Because of the facts and circumstances in that case, it didn't require additional consideration. It arose out of that same underlying transaction. Granted, we had a larger number of days here, but I think the testimony was clear at trial as to why that was. They gave it some time to see if they got the original signatures in and sent it back out. I'm still bothered a bit by the note, and I'll tell you why. I understand this was an SBA form that could not be altered. But the court, in striking the affirmative defenses, made a docket entry on June 15, 2017, that indicates that the terms of the guarantee are the same as the note. It refers, the court is referring to a note. And the bank, I think, filed a motion to strike these affirmative defenses, and I'm looking for the note. Did you attach the note to the affirmative defenses? I need you to motion to strike. I don't recall. Where did the court come up with this note? Well, Your Honor, this was a two-count complaint filed. Count one was a foreclosure action where the note certainly would have been attached as an exhibit. I don't recall off the top of my head without consulting page by page in the record of whether the note was attached as an exhibit to count two, which was enforcement of the guarantee. But it was part of the complaint under consideration by the court, certainly. So the note was. . . Through the foreclosure. I'm sorry, Your Honor. Through the foreclosure, you're right. That's correct, Your Honor, yes. But I do apologize. I don't recall off the top of my head whether it was an exhibit or attached in those earlier pleadings regarding striking the affirmative defenses, whether the note was attached or not. But it seems the court looked at the note in making its decision to strike the affirmative defenses because it specifically references the note. And yet both counsel indicate the note was not the subject of the trial. That's correct, Your Honor. But I would again reiterate that the guarantee itself included the amount of indebtedness, included whose obligation it was that Mr. Darnell was providing a guarantee for, and the bank to whom it was being made, and the additional terms that apply. And I would note in terms of the issue of the alleged fraud, which the court struck that affirmative defense, I did, Your Honor, ask a question of opposing counsel about the notice of appeal. I do not see reference to the affirmative defenses being stricken in the notice of appeal. Just to answer your question on that, if I may. Thank you. But on the fraud issue, I believe Your Honor, Justice Cates talked about going outside the four corners of that agreement. And I would note that within the four corners of that agreement, we certainly take the position that you do not, under the law, go outside the four corners. This is a contract. I agree with Mr. Terlizzi on that. This is a binding contract, and contract law applies. We don't go beyond the four corners. And within those four corners is the statement in all caps, ORAL STATEMENTS NOT BINDING, and then it continues in regular font, GUARANTORMENT NOT USED IN ORAL STATEMENT TO CONTRADICT OR ALTER THE WRITTEN TERMS OF THE NOTE FOR THIS GUARANTEE OR TO RAISE A DEFENSE TO THIS GUARANTEE. That was noted, I believe, by the trial court when it struck the affirmative defense, and we believe it's a vital term of the guarantee that Mr. Darnell had at his disposal to review. I would also note we've cited a couple cases in our brief on this issue, the Northern Trust case and the Rose case. Rose came out of this district, I would add. Our instructive on the issue, the courts in those cases held that an alleged oral promise is not binding to establish fraud where the guarantor had an opportunity to review the written agreement and did, in fact, sign it. And the Northern Trust court had a good quote and then cited the Rose case when it stated a party cannot close his eyes to the contents of a document and then claim that the other party committed fraud merely because it followed this contract. I think that's exactly what we have here. We have this loan that, to use Mr. Terlizzi's words, went south, and which nobody, the bank included, wants to see happen when you enter into these transactions. But now the individual who backed up that loan with a guarantee, an unconditional SBA guarantee, now wants to try to get out of that obligation and is making these arguments to do so. There was, and I would agree with the discussion earlier, why did we even get into the fraud testimony at trial whenever that was stricken as an affirmative offense? And for whatever reason, and I think counsel is correct, it came through an offer of proof. But there was ample testimony there for the court to take into consideration and judge the credibility of the witnesses. I think testimony on that issue came from Mr. Baer, from Mr. Forsen, the borrower in this loan, and from Mr. Garnell and his wife about a meeting with Beau Baer back in February ahead of the May closing and statements that were made. And Mr. Baer did state that he often, in these types of transactions, gets that question, can I be released so many years after the closing of the loan? And he indicated that he gives his standard canned answer that we can certainly consider that, you can apply for it, make that request. If the loan is in good standing, all obligations are met. And if the business, this is a business loan, is showing a positive cash flow and in good standing, then that can be considered. And I believe Beau Baer testified, and I think it's noted in our brief, that he does not recall Mr. Garnell ever making that request subsequently. And we have it. What was the ñ this loan was an old loan, in other words. It had been going on a period of time. Of five years, Your Honor, yes. And what interested me is the fact that Mr. Garnell testified that after three years he was supposed to be released. It seems counterintuitive that if you want to be released from a guarantee, you don't know the terms. I mean, if you're seeking to be released and now you claim you didn't have a contract, I'm not sure how that squares up. But ñ I would certainly concur with that, Your Honor. And I would further state that I don't believe there's testimony that ñ that he did ask to be released subsequently. There was also testimony presented, I would note, that within the first two years of the loan, the alleged promise here is that they are alleging is to be released after two years because ñ and the reason given is because his farm operating loan was coming due in three years, I believe, if I'm not mistaken. And so here we have ñ we had testimony at trial from the bank that ñ that within the first two years of the ñ of this loan, you know, after the 2012 loan was made, within the first two years he hadn't met all his obligations because he hadn't paid the property taxes on the mortgage property. So already just kind of extrapolating it out or going in the hypothetical, if it would have been requested that Mr. Garnell be released, probably wouldn't have been because the loan wasn't in good standing. But that's essentially neither here nor there. Another point I would make on the fraud issue, as we note in our brief, is the Illinois Credits Agreement Act, which lays out that a credit agreement has to be in writing, all of its terms must be in writing, and that the parties cannot seek to enforce oral, verbal terms to modify a written credit agreement. And we cite the Bank One Springfield v. Rossetti case, I believe a fourth district, that applied to that act specifically to a guarantee like we have here. It indicated that ñ Do you really think we need to do that in this case? I don't think you need to even get to that point. I think you don't have to ñ you certainly don't have to go beyond ñ I'm sorry. Why didn't we get to that point? Well, just simply as an alternative theory, if we're not going to go beyond the four corners of the agreement and get into the alleged promises made orally by the bank, and if we don't adhere to the term that I quoted earlier, oral statements are not binding, then simply as an alternative theory, then I think it's barred by statute even to go down that road. But I certainly submit that we don't have to get that far. So what do you think our standard of review is? Do you think that we would interpret this contract de novo, or do we look at the court's order as against the manifest way of the evidence? Well, certainly I think we look at the court's order, its verdict after hearing the evidence, and it would be a manifest way of evidence standard. I think we note that in our brief. I do agree that issues of law are to be reviewed de novo, but I don't think you get beyond that here on those issues. I think the court heard the testimony about how the guarantee came about. The court heard testimony about the court has the black and white terms of that guarantee. The court, on the other issue that hasn't been touched upon about the sale itself and the judgment amount, the court certainly had ample testimony, and we believe that that standard would apply to it, as the court was the trier of fact in this case. Simply touching on the sale issue, certainly we believe there was ample evidence shown at trial that it was a fair and reasonable sale, a fair and reasonable price. The bank, it was a properly noticed sale. None of the grounds by which a confirmation of a foreclosure sale would be denied under the mortgage foreclosure law are present here. We don't have fraud in the sale. Terms were not unconscionable. Simply Mr. Darnell asserts in this appeal that the price was too low, so therefore the deficiency judgment that he owes is too high. But the bank didn't simply throw a dart at the dart board or pick a number out of the air. It had an appraisal commissioned about two months before the sale by Kleeman, and Mr. Kleeman provided testimony via evidence deposition at trial, and went into great detail not only about this appraisal from 2017, I think November of 2017 before the January 2018 sale, about the comparable sales he used, which is a preferred approach, and about even a 2012 appraisal that was commissioned back when this loan was first formed. And wasn't Mr. Darnell present at the sale? He was, and in fact, Your Honor, he was a bidder on the sale. This wasn't your typical, and I do bank work just like Mr. Terlizzi noted, and this wasn't your typical foreclosure sale at the courthouse lobby where the only one showing up is the bank or the bank's attorney in making a bid, and that's it. We had another bidder, and it was Darnell himself. And the bank opened its bidding at 85% of the appraised price. I think Jason Russell from the bank testified to that, as he was the bidder on behalf of People's Bank. And I think that was $76,500. And the appraisal price was $90,000. After Mr. Darnell upped the bidding after the initial bid, then the bank bid $90,000 and bought the property for $90,000. We believe the evidence of trial supports that. We ask the Court to affirm. Thank you so much. Thank you. Mr. Terlizzi. Counsel said that the bank could have sued on the June 2012 full guarantee, but would have, could have, should have, doesn't work in court. They did not sue on it. In fact, we didn't even know about it until trial. So they sued on the May… Did you know about the June guarantee when your client signed it? Yeah. You may not have known about it. I didn't know about it. He should have known about it. He didn't remember a whole lot if you read the transcript about this. I mean, he was helping out a buddy. He signed, apparently, once where he was told to sign. And, I mean, that's pretty good help. He's apparently a good friend. I mean, to commit yourself to that. But they did, they sued, and they did sue on a quantum merit theory. They did sue on a Stopple theory. He had to be a stop because it was in detrimental reliance. They sued on a contract. And so the question this court has to answer is, is that May guarantee a contract? Was there a meeting in the minds of the essential terms of this contract? And I don't think it's a good defense for the bank to say the SBA made me do it. I mean, the SBA form is an SBA form that I think probably anticipated that it's going to be signed contemporaneously with the loan. And this issue never arises. But if it's signed beforehand, I mean, there's no law that I know of, federal law, you're not going to go to federal prison if you had a thing on there, a C note attached as Exhibit A that is intended to be signed. Because when you sign a guarantee before the note, the note doesn't exist. I mean, maybe the debtor will change his mind and not even show up and go somewhere else, get a better interest rate or something. So, you know, you don't have a contract without a meeting of the mind of the essential terms. And, yes, Fitzgerald is signed under Indiana law. And, yes, neither one of us has found a precise Illinois case that deals with, does a pre-signed guarantee have to disclose the interest rate? But, boy, we could cite you 20 or 30 or 100 Illinois cases that say a contract, you have to have a meeting of the minds on the essential terms, whether it's a real estate contract, a loan contract, whatever. In order to affirm this decision, I think this Court has to be prepared to say in its opinion, and this is simply a matter of law, not manifest weight or any interpretation of the facts, has to say that an interest rate is not an essential term of a loan. A court can supply that, whether it's between the original debtor and creditor or whether it's a guarantor. It's not important. It's not essential. And you don't have to agree on that to have an enforceable contract. I think that would be astounding. I think that such a bright-line rule is advisable in a contract case to say that every contract or every guarantee must have an interest rate set forth or there can't possibly be a meeting of the mind. How can you have a loan without an agreement on the interest rate, a meeting of the minds? Isn't that an essential term of a loan contract? But the meeting of the minds is somewhat subjective, isn't it? And you want us to impose an objective test. But I don't think it's subjective in this case, any more than like on a real estate contract. You have to have a meeting of the minds on the description and on the price, when it's payable. I mean, those essential terms. That's not coming up with any new surprising case law. But every contract, you have to be the question, I guess the question of law is, what are the essential terms in each particular contract? And I don't think how you could conceivably say with a straight face that an interest rate and an amortization is not an essential term of a loan contract. I mean, again, isn't that the first question that any potential borrower asks? What are you going to charge me? I want to shop the rate. I want to see if I can get a better rate over here. If you're going to charge me 5, maybe I can get 4 from you. But this note in paragraph 9, I'm sorry, this guarantee, I want to be very careful. In paragraph 9H, evidently, says, Oral statements not binding. Guarantor may not use an oral statement to contradict or alter the written terms of the note or this guarantee, and that goes on, or to raise a defense. It seems to me that when you sign something like that, there's at least a presumption or whatever that you recommend. I mean, that presupposes that what you sign is a valid and binding contract. And let's suppose the name of the debtor was blank. Let's suppose the principal amount was blank, the debtor was blank, and he'd still sign it. I mean, he would sign it, that clause would still be in there, but would that be a contract? Well, I guess we'll find out another day. And you have to go beyond the four corners to look at the note. To know, you have to. I mean, that guarantee doesn't speak for itself. Thank you. So you're asking the court to look? We sure are. Thank you. Thank you, Mr. Terzi. Okay. This matter, 519-0104, please take it under advisement. Thank you, counsel, for your argument.